OPINION
{¶ 1} This appeal is taken from a final judgment of the Geauga County Court of Common Pleas, Juvenile Division. Appellant, Ruth Krems, appeals from the juvenile court's judgment terminating her parental rights and granting permanent custody of her minor son, Robby Krems ("Robby"), to appellee, Geauga County Job and Family Services ("GCJFS").
 {¶ 2} Robby was born in 1995, and for the first seven years of his life he lived with appellant. Robby's biological father, Robert Pugh, Jr. ("Robert"), did not live with Robby and appellant. Robert had minimal contact with Robby and provided little financial support to appellant.
 {¶ 3} Prior to being placed in the temporary custody of GCJFS, Robby and appellant resided in Middlefield Township, Geauga County, Ohio, with Robby's half-brother Kyle Smith Jr. ("Kyle"), age twenty-one, and his second cousins, Mary, born in 1987, and Lynn, born in 1989. On or about May 23, 2002, the juvenile court issued an emergency telephonic order granting GCJFS temporary custody of Robby and his second cousins. The removal of the children from appellant's home was based upon Mary's allegation that Kyle had sexually fondled her on four separate occasions. Furthermore, Lynn alleged that Kyle was the father of her unborn child. All the children were removed from appellant's household to protect them from further sexual abuse.
 {¶ 4} On May 24, 2002, a complaint was filed with the juvenile court claiming that Robby's second cousins were abused pursuant to R.C. 2151.031(A), and asserting that all the children were neglected and dependent children pursuant to R.C.2151.03(A)(2) and (3), and R.C. 2151.04(C). On that same day, a hearing on the complaint was held. At the conclusion of the hearing, the juvenile court did not accept appellant's plea on the complaint and continued GCJFS' temporary custody of the three children. During GCJFS' temporary custody, Robby was placed with a foster family.
 {¶ 5} Thereafter, on June 19, 2003, appellant entered a plea of "true" to the charges contained within the complaint. In addition, appellant agreed that the submitted case plan for reunification with Robby should be adopted as an order of the juvenile court. Subsequently, the adopted case plan was amended and included the following objectives with respect to appellant: (1) participate in an age appropriate parenting class to address Robby's basic needs such as hygiene and nutrition; (2) obtain and maintain stable employment in order to become independent and self-sufficient; (3) complete a psychiatric evaluation; (4) keep home in clean and sanitary condition at all times; and (5) prevent individuals who pose a risk of physical or emotional harm to reside and/or visit her home.
 {¶ 6} On May 23, 2003, GCJFS filed a motion to obtain permanent custody of Robby. A hearing was held on August 27, 2003, to determine whether GCJFS should be granted permanent custody. Robby was appointed legal counsel to represent him in this matter. The following facts were disclosed during the hearing. Chief David Easthon ("Chief Easthon"), of the Middlefield Police Department, testified that Robby was originally placed in the temporary custody of GCJFS as a result of his second cousins' allegations of sexual abuse by Kyle. While in the temporary custody of GCJFS, Robby told Chief Easthon and a social worker that Kyle had sexually fondled him.
 {¶ 7} Dr. Daniel E. Schweid ("Dr. Schweid"), a board certified psychiatrist, provided appellant with psychiatric counseling sessions. During their sessions together, appellant would consistently deny knowledge of Kyle's sexual abuse of Mary and Lynn. When Dr. Schweid informed appellant that Robby had also accused Kyle of sexual abuse, appellant was devastated and angry. Although appellant denied knowledge of Robby being sexually abused, Dr. Schweid testified that evidence of abuse was "wide open" and should have been recognized by appellant. For example, appellant often allowed Kyle, at age nineteen, to bathe in a tub with Robby and at times they slept in the same bed together.
 {¶ 8} Dr. Schweid diagnosed appellant with a mild form of depression and adjustment disorder. He provided her with prescription medications and testified that such a diagnosis did not, standing alone, preclude her from parenting. Because Dr. Schweid knew only a limited amount of information pertaining to appellant's background, he was unable to state a recommendation regarding Robby's permanent custody. However, Dr. Schweid informed the court that appellant was easy to work with as she was open and honest with him, and seemed willing to comply with his directions.
 {¶ 9} Barbara Wiedmann ("Ms. Wiedmann") was assigned by GCJFS to provide Robby with therapy and counseling. After meeting with Robby, Ms. Wiedmann described him as a "special needs" child. Specifically, Ms. Wiedmann testified that Robby at age eight functioned mentally as a four or five year old child. Ms. Wiedmann stated that Robby's developmental delay required a structured home environment. During his therapy sessions with Ms. Wiedmann, Robby established that his home life with appellant was disorganized. Robby explained that he often slept in a different room every night with various members of his family. He further confirmed that he did not have a designated place to eat his meals or a designated bed time. Ms. Wiedmann described Robby's home environment with appellant as "chaotic."
 {¶ 10} On the other hand, when Robby was asked to illustrate life with his foster family, he described a stable and structured family environment. Ms. Wiedmann testified that in the short time with his structured foster family Robby had shown tremendous progress in his mental ability to verbalize his thoughts and his general attitude had greatly improved.
 {¶ 11} Dawn Bates ("Ms. Bates") was assigned by GCJFS to conduct a home study for appellant. Initially, Ms. Bates had difficulty in conducting the home study as appellant had moved in with her boyfriend and his mother. Ms. Bates determined that there was a possible criminal history of sexual abuse relating to the boyfriend's mother. After appellant realized that the home study could not be conducted without receiving more information regarding the mother's criminal background, she decided to move in with her nephew, his wife, and their son.
 {¶ 12} Ms. Bates testified that appellant's nephew's family rented a three bedroom house in Middlefield, Ohio, on a month to month basis. The nephew was unemployed and attempting to collect workers' compensation, while his wife provided the family with their sole source of income by working as an Amish taxi driver.[1] Ms. Bates described the family's house as clean and relatively safe with the exception of a deep hole in the back yard. The family informed Ms. Bates that they were amenable to Robby being placed in their home as long as he remained in appellant's custody. Nevertheless, Ms. Bates ultimately did not recommend the family's household for placement of Robby because appellant had demonstrated poor decision making which consistently placed her children at risk and because the family refused to accept actual custody of Robby.
 {¶ 13} Karen Jeffries ("Ms. Jeffries"), acted as Robby's guardian ad litem, and provided the juvenile court with a written report and testimony regarding her recommendation as to Robby's permanent placement. Ms. Jeffries written report and testimony recommended that GCJFS be granted permanent custody of Robby. First, Ms. Jeffries noted that appellant failed to comply with the case plan's objective requiring her to obtain employment and provide Robby with a stable well structured home environment. During Robby's temporary custody with GCJFS, appellant worked briefly in January 2003, as a part-time employee at Dairy Mart. However, appellant's employment at Dairy Mart was terminated, and Ms. Jeffries noted that appellant failed to actively search for further employment elsewhere.
 {¶ 14} Ms. Jeffries testified positively that appellant had complied with the case plan in other respects, such as attending parenting classes, visiting with her psychiatrist, and attending scheduled visits with Robby. She also explained that Robby had formed a strong bond with his foster family and enjoyed participating in their family activities. Despite this strong bond, Ms. Jeffries also stated that Robby had expressed his desire to live with appellant. Nevertheless, Ms. Jeffries believed that appellant would be unable to provide Robby with a stable place to live based upon her inability to find employment and Robby's need for a structured home life.
 {¶ 15} Julie Dwyer ("Ms. Dwyer") was assigned by GCJFS to act as Robby's social worker. Ms. Dwyer's recommendation to the juvenile court was to grant permanent custody to GCJFS. This recommendation was based upon Ms. Dwyer's personal observation that appellant's inability to obtain employment prohibited her from becoming independent and self-sufficient. Furthermore, although Ms. Dwyer recognized that appellant had attended the required parenting and psychiatric sessions, she described appellant's progress as minimal.
 {¶ 16} Robby's foster mother, Cindy Griffin ("Mrs. Griffin"), testified that when Robby was initially placed in her home he had difficulty cleaning and caring for himself and had to be taught the basics of personal hygiene. She noted that Robby's teeth were in bad shape and required extensive visits with her dentist. Mrs. Griffin stated that she and her family had bonded with Robby and noticed a major improvement in his development since being placed in their home.
 {¶ 17} Appellant also provided testimony during the hearing. Appellant testified that she very much wanted Robby to live with her again. However, appellant admitted on cross-examination that, at the time of the hearing, she was still not ready to take custody of Robby.
 {¶ 18} Appellant further testified with respect to her prior employment history. Specifically, appellant stated that in the eight years prior to GCJFS' temporary custody of Robby she had only obtained employment for a total of ninety days. She further testified that Robby had never seen a dentist because she had been unable to find one that specialized in working with children. Moreover, appellant's testimony revealed that she did not own a vehicle and was not licensed to drive. Appellant stated that she would have to rely upon others to provide transportation.
 {¶ 19} The juvenile court held an in-camera interview with Robby. During the interview, Robby stated that he enjoyed spending time with his foster family. However, Robby also informed the juvenile court that he would like to live with appellant.
 {¶ 20} Following the hearing, the juvenile court issued a judgment entry granting GCJFS permanent custody of Robby. Within its judgment entry, the juvenile court determined that Robby had been abandoned by his biological father and could not be placed within a reasonable time and should not be placed with appellant. The juvenile court further stated, "[t]he court further finds by clear and convincing evidence that it is in the child's best interest that permanent custody of the child be granted to GCJFS. * * * The child has interacted with his mother through regular weekly supervised visits. The child has no difficulty separating from his foster parent's [sic] to visit with his mother and has not had difficulty returning to his foster family at the end of visits with his mother. The child has expressed to the guardian ad litem and to the court that it is his preference to return to live with his mother. The court recognizes the child is 8 years old and it is not uncommon for a child of that age to desire to live with a parent, regardless of the circumstances from which the child was removed. The court finds that the child has developed strong emotional bonds between his foster parents and his foster siblings. He appears to be happy in the foster home and has made significant progress in addressing the developmental delays and dental hygiene issues that the child came into foster care with. The foster family has developed strong emotional attachments to the child and the foster parents have indicated they would seek to adopt the child if the child was made eligible for adoption as a result of these permanent custody proceedings.
 {¶ 21} "* * *
 {¶ 22} "The child has a strong need for a legally secure permanent placement that cannot be achieved without a grant of permanent custody to GCJFS. The guardian ad litem has recommended that GCJFS be granted permanent custody.
 {¶ 23} "* * *
 {¶ 24} "It is therefore the order of this court that the minor child, Robby Krems, * * * be placed in the permanent custody of GCJFS and that the parental rights and responsibilities of Ruth Krems and Robert Pugh, Jr. be terminated."
 {¶ 25} From this judgment, appellant filed a timely notice of appeal and now sets forth two assignments of error for our consideration:
 {¶ 26} "[1.] The trial court erred in granted [sic] the Geauga County Department of Job and Family Services motion for permanent custody thereby terminating the parental rights of appellant Ruth Krems as the trial court's findings were against the manifest weight of [sic] evidence.
 {¶ 27} "[2.] The trial courted [sic] erred in granted [sic] the Geauga County Department of Job and Family Services' motion for permanent custody when the case planning violated appellant's fifth amendment right not to incriminate herself."
 {¶ 28} Under her first assignment of error, appellant argues that the juvenile court's decision to grant GCJFS permanent custody of Robby was against the manifest weight of the evidence. Appellant maintains that she substantially completed all the objectives outlined in the case plan and did everything GCJFS asked her to do to remedy the conditions that had initially caused the children to be placed outside the family home. Specifically, appellant asserts that she has willingly complied with attending the scheduled parenting classes and psychiatric sessions and has obtained a stable and clean home environment.
 {¶ 29} As will be discussed in more detail, the matter before us represents the precise circumstances for which the Ohio General Assembly enacted the statutory time limitations of R.C.2151.414(B). Although appellant was not an evil or abusive mother, there was clear and convincing evidence presented establishing that Robby was victimized by her inability to care for him. The evidence shows a pattern of neglect by appellant which resulted from her failure to have the means to support herself and Robby. As a result, she and Robby were totally dependent, at various times, on her relatives and her boyfriend, thereby creating an unstable home environment for Robby. Rather than allowing Robby to languish in the temporary custody of GCJFS for an extended amount of time, the legislature has determined that a period of twelve months of a consecutive twenty-two month period was an adequate duration of time for appellant to resolve her parenting issues. She has failed to do so.
 {¶ 30} R.C. 2151.414 sets forth the guidelines that a juvenile court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates that the juvenile court must schedule a hearing, and provide notice, upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.
 {¶ 31} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (1) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (2) the child is abandoned and the parents cannot be located; (3) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (4) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 32} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody. In practice, the juvenile court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.
 {¶ 33} If the child is not abandoned or orphaned, then the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the juvenile court must consider all relevant evidence before making this determination. The juvenile court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the conditions enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.
 {¶ 34} Assuming the juvenile court ascertains that one of the four circumstances listed in R.C. 2151.414(B)(1)(a) through (d) is present, then the court proceeds to an analysis of the child's best interest. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates that the juvenile court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
 {¶ 35} The juvenile court may terminate the rights of a natural parent and grant permanent custody of the child to the moving party only if it determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency that filed the motion, and that one of the four circumstances delineated in R.C.2151.414(B)(1)(a) through (d) is present. Clear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. In re Holcomb (1985), 18 Ohio St.3d 361, 368. An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence. Inre Jacobs (Aug. 25, 2000), 11th Dist. No. 99-G-2231, 2000 Ohio App. LEXIS 3859, at 8.
 {¶ 36} First, we note that the juvenile court properly determined that appellant had been provided with parenting classes, counseling services, psychiatric services, and case management services. Furthermore, the juvenile court appropriately noted that Robby had interacted with appellant on a weekly basis and that he had expressed his preference to live with his mother.
 {¶ 37} Notwithstanding these factual conclusions, the juvenile court made the initial determination under R.C.2151.414(B)(1) that Robby was neither abandoned nor orphaned, but that he could not be placed with appellant within a reasonable period of time and should not be placed with her. It further recognized that Robby had been in the temporary custody of GCJFS for more than twelve months of a consecutive twenty two month period.
 {¶ 38} The court then proceeded to determine, by clear and convincing evidence, that appellant had not substantially complied with the case plan as she had failed to obtain employment or provide Robby with a stable home environment. In doing so, the juvenile court had a substantial amount of clear and convincing evidence to base its determination. Namely, testimony and evidence presented during the trial demonstrated that appellant had only obtained employment for a month during the implementation of the case plan. Testimony at trial revealed that appellant was not actively searching for employment. Moreover, both Robby's guardian ad litem and social worker expressly recommended that permanent custody be granted to GCJFS because Ruth would be unable to provide Robby with the appropriate parental care.
 {¶ 39} The juvenile court noted that appellant's failure to obtain regular employment has perpetuated her inability to provide a stable home environment. She was currently living with her unemployed nephew and his family in a three bedroom monthly rental house. They were supported by a single income derived from his wife's Amish taxi service. The wife testified at trial that, ultimately, if there were any financial hardships her family would come first. Even appellant admitted that she was not ready to take custody of Robby.
 {¶ 40} Based upon appellant's inability to obtain employment, Ms. Jeffries and Ms. Dwyer testified that appellant would be unable to provide Robby with a structured home environment. Therefore, they both recommended that permanent custody be granted to GCJFS.
 {¶ 41} Although appellant argues that it was improper for the juvenile court to grant permanent custody to GCJFS based solely on her inability to obtain employment, this court has previously affirmed the termination of parental rights on this basis alone. See, e.g., In re Cather, 11th Dist. Nos. 2002-P-0014, 2002-P-0015 and 2002-P-0016, 2002-Ohio-4519, at ¶ 45 (holding that the parent's failure to seek and obtain employment to help maintain stable housing established clear and convincing evidence that the parent did not substantially comply with the case plan and, therefore, the termination of parental rights was proper).
 {¶ 42} The ability to be employed cannot be viewed in a vacuum. Appellant's ability to obtain stable employment and maintain a home, structured or otherwise, was particularly important in the case at bar as Robby was a "special needs" child requiring a structured family life. Without this structured environment, Robby's delayed development would continue.
 {¶ 43} The evidence at trial confirmed that even when appellant had Robby in her care, she was unable to remedy the disorganized and unstable household that resulted in his developmental delays. Further, as previously indicated, the evidence showed appellant was dependent on others for her own care and support as well as that of her child. Such a dependency caused her to be unwilling or unable to appreciate how vulnerable this made her and her child to unscrupulous providers.
 {¶ 44} Appellant's own testimony demonstrates a pattern of neglect that has yet to be resolved. Specifically, appellant has a long history of an unwillingness or inability to provide for herself and Robby. Her testimony establishes that prior to GCJFS' temporary custody of Robby she failed to actively seek employment despite her family's financial difficulties and Robby's need for a stable home environment. Even while unemployed, appellant did not exercise the fundamental parenting skills necessary to safeguard Robby from sexual abuse, provide a structured daily routine, or properly care for such basics as Robby's personal hygiene. Appellant's problems continued throughout GCJFS' custody of Robby as it is clear that appellant failed to obtain or adequately seek employment and has left the responsibility of providing Robby with a stable home life to others.
 {¶ 45} Again, appellant's failure to resolve these issues is accentuated by Robby's developmental delay. Robby simply does not have the tools to adapt to the difficult and uncertain home life that appellant has created.
 {¶ 46} As noted above, there was clear and convincing evidence provided to support the juvenile court's determination to grant permanent custody to GCJFS. Thus, the juvenile court's decision was not against the manifest weight of the evidence. Appellant's first assignment of error is without merit.
 {¶ 47} Under her second assignment of error, appellant contends that the trial court violated her constitutional right against self-incrimination by requiring her to admit that she believed Robby was sexually abused. In short, appellant argues that she was "forced to choose between prevailing on her defense to the permanent custody motion by admitting that she believes that [Robby] was abused and relinquishing her right to contest an abuse complaint or criminal charge, neither of which had been filed by the trial court."
 {¶ 48} Pursuant to the Fifth Amendment of the United States Constitution, "[n]o person * * * shall be compelled in any criminal case to be a witness against himself." After careful examination of the record before us, we conclude that there is no evidence demonstrating that appellant was forced to act as a witness against herself. Specifically, the case plan adopted by the parties did not require appellant to admit or believe that Robby was sexually abused. To the contrary, the case plan's main objectives were to assist appellant in providing Robby with a safe and stable environment. By failing to obtain regular employment, appellant was unable to provide the structured household that Robby so desperately needed.
 {¶ 49} Although evidence presented at the hearing demonstrated that appellant's belief of Robby's sexual abuse could possibly aid in his reunification with appellant, the juvenile court ultimately based its decision upon appellant's failure to comply with the adopted case plan's requirement for obtaining stable employment and providing a structured household. Appellant has simply failed to present any evidence that she was forced to be a witness against herself. Thus, appellant's second assignment of error is without merit.
 {¶ 50} Based upon the foregoing analysis, appellant's two assignments of error are without merit. The judgment of the juvenile court, therefore, is affirmed.
Judgment affirmed.
Ford, P.J., concurs.
O'Neill, J., dissents with dissenting opinion.
[1] Testimony at trial revealed that her nephew had received workers' compensation for a limited duration, but such compensation had been terminated.